UNITED STATES DISTRICT COURT
DISTRICT OF NEW MEXICO

ALFONSO MURRIETTA,

    Petitioner,

v.                                                           No. 16 CV 537 JAP/KBM

UNITED STATES DEPARTMENT
OF JUSTICE, CIVIL DIVISION,
RADIATION EXPOSURE
COMPENSATION PROGRAM,

    Respondent.

### MEMORANDUM OPINION AND ORDER

Petitioner Alfonso Murrietta (Petitioner) appeals the denial by the Department of Justice (DOJ) of his claim for compensation under the Radiation Exposure Compensation Act (RECA), 42 U.S.C. § 2210 note. *See* PETITION FOR REVIEW OF FINAL DECISION DENYING COMPENSATION TO WIDOWER (Doc. No. 1) (Complaint). DOJ did not file an answer, but instead moved to dismiss Petitioner's claim under Fed. R. Civ. P. 12(b)(6), arguing that Petitioner is ineligible for compensation under RECA as a matter of law. *See* RESPONDENT'S MOTION TO DISMISS (Doc. No. 9) (Motion); RESPONDENT'S MEMORANDUM OF LAW IN SUPPORT OF ITS MOTION TO DISMISS (Doc. No. 9-1) (Memorandum); RESPONDENT'S REPLY MEMORANDUM IN SUPPORT OF ITS MOTION TO DISMISS (Doc. No. 16). Petitioner responds that DOJ's technical interpretation of RECA is contrary to the statutory language and to congressional intent to provide broad compassionate compensation to individuals who were exposed to radiation as part of the United States' nuclear weapons

1

program. *See* RESPONSE TO DEFENDANTS' MOTION TO DISMISS (Doc. 14) (Response). The Court will deny the Motion.

## I.     BACKGROUND

Petitioner is a widower whose wife, Rica Murrietta, died of kidney cancer in 2010. Complaint ¶ 1; Response at 3. Ms. Murrietta had been employed by Zuni Trucking in Grants, New Mexico, between 1952 and 1956. Complaint Ex. 1, DOJ Appeal Memorandum at 6; Response at 3–4. Zuni Trucking hauled uranium ore. Complaint Ex. 1 at 6; Response at 3. Ms. Murrietta managed the shop where the ore-hauling trucks were stored and maintained. Complaint Ex. 1 at 6. Her duties included documenting the uranium ore being hauled and cleaning the trucks and barrels used to transport it. Complaint ¶ 19; Complaint Ex. 1 at 6–7; Response at 4. After Ms. Murrietta died Petitioner filed a claim for compensation under RECA as her surviving spouse, based on Ms. Murrietta's past employment in the uranium industry and on the illness that caused her death. Complaint ¶¶ 1–3.

RECA is a statutory compensation scheme enacted by Congress in 1990 to provide partial restitution to certain individuals who developed a variety of serious illnesses after exposure to radiation from atmospheric nuclear tests or underground uranium mining. *See* Pub. L. No. 101-426, § 2, 104 Stat. 920 (1990) (codified as amended at 42 U.S.C. § 2210 note). RECA recognized that these individuals had been "involuntarily subjected to increased risk of injury and disease to serve the national security interests of the United States." *Id.* § 2(a)(5). While eligible uranium-industry employees under RECA were originally limited to "individual[s] who [had been] employed in a uranium mine," *id.* § 5(a), Congress later expanded eligibility by amendment. *See* Pub. L. No. 106-245, § 3(c)(1)(a)(1)(A), 114 Stat. 501 (2000) (codified as amended at 42 U.S.C. § 2210 note).

In support of the amendments, Congress found that "above-ground uranium miners, millers and individuals who transported ore should be fairly compensated, in a manner similar to that provided for underground uranium miners." *Id.* § 2(5). The 2000 amendments to RECA provide $100,000 compensation to any individual who:

> (i) was employed in a uranium mine or uranium mill (including any individual who was employed in the transport of uranium ore or vanadium-uranium ore from such mine or mill) located in Colorado, New Mexico, Arizona, Wyoming, South Dakota, Washington, Utah, Idaho, North Dakota, Oregon, and Texas at any time during the period beginning on January 1, 1942, and ending on December 31, 1971; and
> (ii)(I) was a miner exposed to 40 or more working level months of radiation and submits written medical documentation that the individual, after that exposure, developed lung cancer or a nonmalignant respiratory disease; or
> (II) was a miller or ore transporter who worked for at least 1 year during the period described under clause (i) and submits written medical documentation that the individual, after that exposure, developed lung cancer or a nonmalignant respiratory disease or renal cancers and other chronic renal disease including nephritis and kidney tubal tissue injury;

42 U.S.C. § 2210 note § 5(a)(1)(A). The amended statute further states that, "All reasonable doubt with regard to whether a claim meets the requirements of this Act shall be resolved in favor of the claimant." *Id.* § 6(b)(1).

Congress charged DOJ with issuing regulations implementing RECA, establishing procedures for filing claims, and evaluating the claims that were filed. *See* 42 U.S.C. § 2210 note § 6(a)–(b), (j). In the administrative processing of Petitioner's claim, DOJ concluded that Ms. Murrietta's position as a shop manager did not qualify her as an ore transporter and that she was therefore ineligible for compensation. *See* Complaint Ex. 1 at 7–8; Memorandum at 1–2. DOJ affirmed its denial in Petitioner's administrative appeal. *See* Complaint Ex. 1 at 12. Petitioner seeks judicial review of the denial, *see* 42 U.S.C. § 2210 note § 6(l), asserting that Ms. Murrietta's employment duties qualify her as an "ore transporter" under both the statutory language and the regulatory definitions in light of Congress' intent to provide broad

3

compensation to workers based on radiation exposure and not on job title, and in view of RECA's specification that any doubts as to eligibility must be resolved in Petitioner's favor. *See* Complaint ¶¶ 1–2, 13–19. DOJ moves to dismiss Petitioner's Complaint on the grounds that Ms. Murrietta's past employment did not meet the statutory requirements of RECA as implemented by DOJ regulations. *See* Memorandum at 1–2.

## II. STANDARD OF REVIEW

RECA provides that "[a]n individual whose claim for compensation under this Act is denied may seek judicial review solely in a district court of the United States. The court shall review the denial on the administrative record and shall hold unlawful and set aside the denial if it is arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 42 U.S.C. § 2210 note § 6(l). DOJ asserts, however, that record review is not necessary to resolve the question of whether Ms. Murrietta's employment fails to meet RECA's statutory requirements for eligibility as an ore transporter. *See* Memorandum at 2 n.2. DOJ asks this Court to dismiss Petitioner's Complaint for failure to state a claim without examining the administrative record. *See id.*

Whether Petitioner has failed to state a claim depends on whether DOJ appropriately interpreted RECA when it concluded that Ms. Murrietta was not eligible for compensation. When "review[ing] an agency's construction of the statute which it administers," the Court first determines "whether Congress has directly spoken to the precise question at issue." *Chevron, U.S.A., Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837, 842 (1984). "If the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress." *Id.* at 842–843. But "if the statute is silent or ambiguous with respect to the specific issue, the question for the court is whether the

agency's answer is based on a permissible construction of the statute." *Id.* at 843. The Court will not defer to an agency's interpretation that is "arbitrary, capricious, or manifestly contrary to the statute." *Keetoowah Band of Cherokee Indians of Okla. v. U.S. Dep't of Housing and Urban Dev.*, 567 F.3d 1235, 1240 (10th Cir. 2009).

Because DOJ is charged with the administration of RECA, *see* 42 U.S.C. § 2210 note § 6(a)–(b), (j), DOJ is tasked with filling any gaps in the statute. *Chevron*, 467 U.S. at 843 ("'The power of an administrative agency to administer a congressionally created . . . program necessarily requires the formulation of policy and the making of rules to fill any gap left, implicitly or explicitly, by Congress.'" (quoting *Morton v. Ruiz*, 415 U.S. 199, 231 (1974)). DOJ regulations implementing RECA are entitled to "controlling weight unless they are arbitrary, capricious, or manifestly contrary to the statute." *Chevron*, 467 U.S. at 843. "Regulations, in order to be valid, must be consistent with the statute under which they are promulgated." *Decker v. Northwest Environmental Defense Center*, 133 S.Ct. 1326, 1334 (2013).

"Regulations are generally subject to the same rules of construction as statutes." *Biodiversity Conservation Alliance v. Jiron*, 762 F.3d 1036, 1062 (10th Cir. 2014) (internal citation and quotation marks omitted). "If the meaning is plain, it controls." *Id.* But where more than one interpretation is permissible, DOJ's explanation of its own rules is "controlling unless plainly erroneous or inconsistent with the regulation." *Auer v. Robbins*, 519 U.S. 452, 461 (1997) (internal quotation marks omitted). The Court will defer to DOJ's construction if it "is a reasonable interpretation of its own regulation." *Decker* 133 S.Ct. at 1331.

### III. DISCUSSION

"A motion to dismiss for failure to state a claim 'admits all well-pleaded facts in the complaint as distinguished from conclusory allegations.'" *Hackwell v. United States*, 491 F.3d

1229, 1233 (10th Cir. 2007). Ms. Murrietta worked for a uranium-hauling company in the covered state of New Mexico for a sufficient length of time during the appropriate time period to be eligible for compensation under RECA. *See* Complaint ¶ 17; Complaint Ex. 1 at 9. Ms. Murrietta was a shop manager whose employment duties included logging the ore that was hauled and cleaning the trucks and the barrels used to transport the uranium. *See* Complaint ¶ 19; Complaint Ex. 1 at 4. She was exposed to radiation while performing these duties, and she later died from an illness for which RECA provides compensation. *See* Complaint ¶¶ 17, 19; Complaint Ex. 1 at 4, 9. But the parties contest whether Ms. Murrietta's employment history is sufficient to qualify her as an "ore transporter" under RECA. DOJ asserts that the statute and regulations require Ms. Murrietta to have "carried," "moved," or "hauled" the ore herself. Memorandum at 8. Petitioner contends that this narrow interpretation is contrary to congressional intent in enacting RECA. Complaint ¶ 23.

The statutory language requires Ms. Murrietta to have been an "ore transporter" who was "employed in the transport of uranium ore" to be eligible for compensation. 42 U.S.C. § 2210 note § 5(a)(1)(A). But RECA itself does not define those phrases. In determining whether the statute is ambiguous, the Court "employ[s] traditional tools of statutory construction, includ[ing] examination of the statute's text, structure, purpose, history, and relationship to other statutes." *Hackwell*, 491 F.3d at 1233 (internal quotation marks and citation omitted). The parties do not dispute that Ms. Murrietta's employment related to uranium ore; at issue is the meaning of "transporter" and "employed in the transport."

The Court first considers the plain language of the statute. *See Woods v. Standard Ins. Co.*, 771 F.3d 1257, 1265 (10th Cir. 2014). The word "transporter" is defined as "[a] person or thing that transports something." Oxford Dictionaries (Oxford University Press),

6

https://premium.oxforddictionaries.com. To transport something is to "[t]ake or carry . . . from one place to another by means of a vehicle, aircraft, or ship." *Id.*; *see also Transport*, Black's Law Dictionary (10th ed. 2014) ("To carry or convey (a thing) from one place to another."). But the "transport" can refer to either "[t]he action of transporting something" or to the broader "system or means of conveying people or goods from place to place." Oxford Dictionaries, https://premium.oxforddictionaries.com.

In *Muscarello v. United States*, 524 U.S. 125, 128, 134 (1998), the Supreme Court drew a distinction between "carry" and "transport" when construing the phrase "carries a firearm." The Court explained that "'[c]arry' implies personal agency and some degree of possession, whereas 'transport' does not have such a limited connotation and, in addition, implies the movement of goods in bulk over great distances." *Id.* at 134.

> If Smith, for example, calls a parcel delivery service, which sends a truck to Smith's house to pick up Smith's package and take it to Los Angeles, one might say that Smith has shipped the package and the parcel delivery service has transported the package. But only the truck driver has "carried" the package. . . . Therefore, "transport" is a broader category that includes "carry" but also encompasses other activity.

*Id.* at 135. This reasoning illustrates that the ordinary meaning of "ore transporter" and "employed in the transport" is not limited only to workers who actually carried the uranium ore or drove the truck in which it was moved, but could also include employees involved in other aspects of the ore-hauling process.

Because the plain language is not dispositive, the Court looks to other indications of congressional intent. *See Woods*, 771 F.3d at 1265 ("If the statute's plain language is ambiguous as to Congressional intent, we look to the legislative history and the underlying public policy of the statute." (internal quotation marks omitted)). RECA was enacted "to make partial restitution" for the increased risk of injury and disease suffered by uranium miners and individuals who lived

7

downwind of nuclear testing areas, and as a congressional apology "on behalf of the Nation to the individuals . . . and their families for the hardships they have endured." Pub. L. No. 101-426, § 2. Congress found that "the United States should recognize and assume responsibility for the harm done to these individuals" whose health was put at risk "to serve the national security interests of the United States." *Id.* "RECA was intended to provide fair and swift compensation . . . for radiation-related illnesses." 145 Cong. Rec. 30946 (1999).

RECA originally provided compensation to uranium industry workers only if they had been "employed in a uranium mine." Pub. L. No. 101-426 § 5(a). But Congress expanded RECA's coverage after concluding that the list of compensable diseases and workers in the original enactment did not accurately represent the risks of radiation exposure. 145 Cong. Rec. 30946 (1999). After RECA was enacted in 1990, advances in medical science demonstrated "that prolonged radiation exposure can cause many additional diseases" and "that the risks of disease associated with radiation exposure were not necessarily limited to those who worked in unventilated mines" but extended to "above-ground and open-pit miners, millers and transport workers." *Id.* Congress found that "above-ground uranium miners, millers and individuals who transported ore should be fairly compensated, in a manner similar to that provided for underground uranium miners." Pub. L. No. 106-245, § 2(5).

The amended version of RECA "use[d] the best available science to make sure that those who were injured by radiation exposure are compensated." 145 Cong. Rec. 30946 (1999). The eligibility provisions for all workers are worded in terms of occupation, requiring that an individual "was employed in a uranium mine or uranium mill (including any individual who was employed in the transport of uranium ore from such mine or mill)" *and* "was a miner" or "was a miller or ore transporter." 42 U.S.C. § 2210 note § 5(a)(1)(A) (emphasis added). But interpreting

these categories to be defined by job title alone would ignore RECA's broad purpose: to compensate individuals who were harmed by radiation exposure incurred through their employment for the benefit of the United States' nuclear weapons program, *see* 42 U.S.C. § 2210 note § 2. *See also* 146 Cong. Rec. 12895 (2000) ("During the period of 1947 to 1961, the Federal Government controlled all aspects of the production of nuclear fuel. . . . The government has the responsibility to compensate all those adversely affected and who have suffered health problems because they were not adequately informed of the risks they faced while mining, milling, and transporting uranium ore."). The legislative history of RECA demonstrates that Congress intended to extend eligibility to workers who were exposed to radiation through employment in the uranium-production industry. Consideration of the context of employment, not only an individual's occupational title, is necessary to fulfill RECA's statutory purpose.

      The Court finds additional support for a broad interpretation of RECA in the Energy Employees Occupational Illness Compensation Program Act of 2000 (EEOICP), 42 U.S.C. §§ 7384 to 7385s-16. In a manner similar to RECA, this legislation provides $150,000 in compensation for certain beryllium and radiation-related diseases determined to have been sustained in the performance of duty at a Department of Energy or atomic weapons employer facility. §§ 7384, 7384d, 7384l, 7384n, 7384s. Whether a radiation-related illness is attributed to this employment depends on the radiation dose likely to have been received by the employee at the facility and the probability of causation dependent on illness, exposure, and other relevant health factors. § 7384n. Radiation received "from facilities, materials, devices, or byproducts used or generated in the research, development, production, dismantlement, transportation, or testing of nuclear weapons, or from any activities to research, produce, process, store, remediate, or dispose of radioactive materials by or on behalf of the Department of Energy," along with

radiation received "from [another] source . . . that is not distinguishable through reliable documentation" is considered part of the dose received "at the facility." *Id.*

The EEOICP applies to a broad group of radiation-exposed employees, but to avoid duplicating the compensation provided by RECA the EEOICP specifically excludes uranium employees from its general scheme. *See* § 7384l (defining covered employees to include individuals employed in "processing or producing, for the use by the United States, material that emitted radiation and was used in the production of an atomic weapon, excluding uranium mining and milling."). Instead, the EEOICP is designed to coordinate with RECA to provide an equal award to employees covered under either statute. *See* § 7384u. The EEOICP states that a uranium employee who is awarded $100,000 under RECA "shall receive compensation under this section in the amount of $50,000." § 7384u.

The Court concludes, from this planned coordination and the lack of any further EEOICP qualifications for successful RECA claimants, that Congress intended RECA and EEOICP to be similarly administered based on the exposure an employee was likely to have incurred when fulfilling the duties of employment. DOJ implicitly acknowledged this by defining "miner" and "miller" to include all individuals who worked at a uranium mine or mill, regardless of their job title or occupational duties. *See* 28 CFR § 79.41(e) ("Miner or uranium mine worker means a person who operated or otherwise worked in a uranium mine."); 28 CFR § 79.51(g) ("Miller or uranium mill worker means a person who operated or otherwise worked in a uranium mill."). The place of employment is an appropriate boundary of eligibility for those workers because the radiation exposure would have occurred at those fixed locations and would have potentially affected all workers present regardless of their title or duties.

While there is no regulation that defines "ore transporter" as a stand-alone term, DOJ has defined "employment as an ore transporter" as "employment involving the transporting or hauling of uranium ore or vanadium-uranium ore from a uranium mine or uranium mill, including the transportation or hauling of ore from an ore buying station, 'upgrader,' 'concentrator' facility, or pilot plant by means of truck, rail or barge." 28 CFR § 79.61(d). As with the statutory terms, the regulatory language "employment involving the transporting" could be narrowly interpreted to require a worker to have actually moved the ore, or could apply more broadly to those whose job duties were part of the ore-hauling process. In contrast with miners and millers, eligibility for ore transporters is appropriately determined by occupational duties because it was those duties, rather than presence in a specific location, that would have caused the radiation exposure. But as in the EEOICP, a broad range of duties could properly be considered to have contributed to the dose of radiation an employee received. *See* § 7384n (including radiation received "from facilities, materials, devices, or byproducts used or generated in the research, development, production, dismantlement, transportation, or testing of nuclear weapons, or from any activities to research, produce, process, store, remediate, or dispose of radioactive materials by or on behalf of the Department of Energy," along with radiation received "from [another] source . . . that is not distinguishable through reliable documentation.").

The Court concludes that nothing in RECA or the DOJ regulations requires that an ore transporter must have actually "carried," "moved," or "hauled" the ore. Instead, the history and purpose of RECA make clear that Congress intended to compensate those uranium-industry workers who had been exposed to radiation through their employment in a manner that was likely to increase their risk of developing certain diseases. The parallel structure of the statute to the regulations reveals that miner, miller, and ore transporter are categories designed to capture

all facets of uranium production, from the removal of the ore from the ground to the delivery of usable uranium for the nuclear industry, and to offer compensation for the likely diseases caused by sufficient exposure due to that employment. *See* 42 U.S.C. § 2210 note § 5(a)(1)(A) (allowing compensation for each type of employee with proof of at least one year of employment and development of a qualifying disease "after that exposure."). The Court concludes that an "ore transporter" who was "employed in the transport of uranium ore" is someone whose employment duties, as part of the system for conveying uranium from mines and mills, caused them to be exposed to radiation and its resultant health risks at levels comparable to that of a miner or miller.

DOJ asserts that even if the language of RECA does not require an ore transporter to have physically moved the ore, DOJ's narrow construction of the statute is permissible because "carry" is one definition of "transport." *See* Memorandum at 10–11. Additionally, DOJ maintains that it has consistently interpreted its own regulatory definition to be so limited and that the Court must give this view controlling weight. *See id.* During the rulemaking process, "[s]everal commenters asked whether mechanics, mine road maintenance workers, and other shop workers would be classified as ore transporters." 9 Fed. Reg. 13628, 13631 (Mar. 23, 2004). DOJ responded that "[w]hile the definitions of miner, miller, and ore transporter are drafted broadly, the extension of coverage to mechanics, mine road maintenance workers, and other shop workers would not be consistent with the Act. . . . [O]re transporters include individuals 'employed in the transport of uranium ore or vanadium uranium ore' from a mine or mill." *Id.* DOJ denied Petitioner's claim in reliance on this language, concluding that Ms. Murrietta was a "shop worker" and therefore that she was not an "ore transporter." *See* Complaint Ex. 1 at 7, 11.

The Court rejects DOJ's narrow interpretation equating "transport" with "carry" or "haul" because it would frustrate the purpose of RECA by limiting the eligibility of workers in a manner that is not necessarily consistent with their exposure. *See Hackwell*, 491 F.3d at 1237 (rejecting DOJ's interpretation of "services rendered" in RECA because it would frustrate congressional intent). Additionally, even if DOJ's statement during the rulemaking process were to be given controlling weight, the Court disagrees that it would require Ms. Murrietta to have carried or hauled the ore herself because DOJ's interpretive statement suffers from the same potential ambiguity in the meaning of "transport" as do the statute and the regulation. The Court agrees with DOJ that "mere employment for a company engaged 'in the transport of uranium ore' does not satisfy the exposure eligibility criteria of the Act," Complaint Ex. 1 at 8, because the simple fact of such employment does not prove radiation exposure. But as DOJ itself acknowledged in its administrative decision, "the Act and its implementing regulations do not limit compensation exclusively to individuals who drove a vehicle hauling uranium ore." Complaint Ex. 1 at 7.

Consistent with congressional intent, whether an individual qualifies as an ore transporter under RECA must be decided based on the radiation exposure that person would have been likely to incur through the person's occupational duties, which need not have included the actual carrying of ore. A mechanic, mine road worker, or shop worker who was sufficiently removed from the ore-transportation process would have been unlikely to suffer from the increased health risks for which RECA is intended to compensate, and they should be excluded from coverage on that basis. But a uranium industry worker should not be excluded as a matter of law based only on the title of the worker's position. DOJ acknowledged as much in its original denial of Petitioner's claim, when it concluded that Ms. Murrietta was ineligible not just because she was

a shop manager, but because there was "no evidence that 'associate[s] the duties of a shop manager with the duties of individuals employed as ore transporters.'" Complaint Ex. 1 at 7. The Court is unable to properly evaluate this conclusion about evidentiary insufficiency without reviewing its factual basis, presumably contained within the administrative record. The Court will therefore deny the Motion, direct DOJ to respond to the Complaint, and request production of the administrative record.

    IT IS ORDERED that:

    1.    RESPONDENT'S MOTION TO DISMISS (Doc. No. 9) is DENIED.

    2.    DOJ must respond to PETITION FOR REVIEW OF FINAL DECISION DENYING COMPENSATION TO WIDOWER (Doc. No. 1) by November 28, 2016.

    3.    The parties must provide the Court with the full administrative record for review.

_____
SENIOR UNITED STATES DISTRICT JUDGE